1  **BURSOR & FISHER, P.A.**
   L. Timothy Fisher (State Bar No. 191626)
2  Sarah N. Westcot (State Bar No. 264916)
   1990 North California Boulevard, Suite 940
3  Walnut Creek, CA 94596
   Telephone: (925) 300-4455
4  Facsimile: (925) 407-2700
   E-Mail: ltfisher@bursor.com
5          swestcot@bursor.com

6  **BURSOR & FISHER, P.A.**
   Scott A. Bursor (State Bar No. 276006)
7  369 Lexington Avenue, 10th Floor
   New York, NY 10017
8  Telephone: (212) 989-9113
   Facsimile: (212) 989-9163
9  E-Mail: scott@bursor.com

10 *Attorneys for Plaintiff*

11
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FILED**

MAR 29 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISON

C12-01565 PSG

ADR

NICHOLAS ANDERSON, individually and on behalf of all others similarly situated,

                                    Plaintiff,

                    v.

GOOGLE INC.

                                    Defendant.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

CLASS ACTION COMPLAINT

ORIGINAL

1
2
3
4

   Plaintiff Nicholas Anderson brings this action on behalf of himself and all others similarly situated against defendant Google Inc. ("Google"). Plaintiff makes the following allegations upon information and belief, except as to allegations specifically pertaining to him, which is based on personal knowledge.

5

## NATURE OF THE ACTION

6
7
8
9

   1.     Google is an advertising company. Its business model is to deliver targeted advertisements through free web-based services. These services include Google Search, Gmail, YouTube, and Google+. In 2011, Google's revenues were $37.91 billion, of which $36.53 billion came from advertising.

10
11
12
13
14
15
16

   2.     Google's success is attributed to its ability to deliver highly-relevant, targeted advertisements. In order to accomplish this, Google logs personalized information, browsing habits, purchasing information, and other demographic information ("user data"). For example, Google records users' search histories on Google Search, their real name on Google+, and the types of websites they visit. Google then place specific advertisements on user's webpages based on the user's individual interests and online habits. Advertisers are willing to pay a premium to advertise with Google because of their ability to place individually targeted ads.

17
18
19
20
21
22
23

   3.     Prior to March 1, 2012, Google placed targeted ads based on a user's online habits within a specific Google service. For example, when displaying ads in YouTube, Google targeted specific ads based only on a user's prior YouTube use. Google did not target a YouTube user's ads based on that user's history within other Google services, for instance their Google search history or the content of their Gmail messages. In short, Google did not consolidate user data across the various Google services. Google users expected this level of privacy when they signed up for Google services.

24
25
26
27

   4.     However, Facebook has recently emerged as a threat to Google's dominance. Facebook has superior user data. When users register for Facebook, they must submit their names, genders, and birthdays. Users then create profiles and participate in online events. In doing so, users voluntarily submit lists of friends, their interests, their favorite shows, their favorite music,

28

CLASS ACTION COMPLAINT

1

1  what products they use, what webpages they read, what games they play, and what movies they

2  watch. This information is also used by Facebook to target advertisements.

3          5.      Threatened, Google decided to consolidate user data across its various services in

4  order to enhance their advertising capabilities and draw a premium from potential advertisers for

5  the placement of targeted ads.

6          6.      Google announced a new Privacy Policy, which went into effect March 1, 2012.

7  The new policy eliminated every previous privacy policy, across all Google services and allowed

8  Google to consolidate user data. For example, user data in Google+ is now available to YouTube.

9          7.      On January 30, 2012, Google circulated a letter to Congress explaining the change.

10 Google explained the new Privacy Policy was for the sake of simplicity, and it would improve

11 users' experiences on Google services. Google did not address advertising in detail.

12         8.      Google misrepresented the reason behind the decision to consolidate user data. The

13 decision to consolidate user data resulted from competition from Facebook and the desire to

14 increase advertising revenue.

15         9.      Google wrote, "We are not selling our users' data." This is misleading. Advertisers

16 pay a premium to place their ads with Google due to Google's ability to employ user data for

17 targeted ads. User data is a material factor when advertisers partner with Google — advertisers

18 know Google has an unparalleled ability to place highly-relevant, targeted ads by analyzing user

19 data.

20         10.     Google's previous privacy policies prohibited the consolidation of user data. They

21 stated, "When you sign up for a particular service that requires registration, we ask you to provide

22 personal information. If we use this information in a manner different than the purpose for which it

23 was collected, then we will ask for your consent prior to such use." However, "the purpose for

24 which [user data] was collected" was to set up and run users' accounts. It was not for tracking and

25 advertising. Google users did not agree to have Google consolidate their user data for advertising

26 purposes. Users did not agree to share their private online habits across Google's dozens of

27 different services.

28

CLASS ACTION COMPLAINT                                                                        2

11.     Users did not consent to the change in the Privacy Policy.  Google did not provide a simple and effective way to opt out of the policy.  Users instead must manage their privacy settings within each Google service.

12.     Users with Android phones are in the worst position.  Google connectivity is heavily integrated into these devices.  Google connectivity is used for email, chat, and purchasing content.  If an Android user does not agree to Google's new Privacy Policy, their only remedy is to discard the phone or cease using smartphone functionality.

## PARTIES

13.     Plaintiff Nicholas Anderson is a citizen of the State of California, residing in San Francisco, California.  Mr. Anderson purchased an Android phone prior to March 1, 2012 for approximately $100.  Plaintiff was familiar with Google's previous privacy policies, and he relied on such misrepresentations in deciding to purchase his Android phone.  Plaintiff would not have purchased his Android phone had he known that Google would breach these policies by consolidating his user data.

14.     Defendant Google Inc. ("Google") operates the websites www.google.com, www.gmail.com, www.youtube.com, and www.blogger.com.  Google's services include Google Search, Gmail, YouTube, Google+, and dozens of other products.  Google is a Delaware corporation registered with the California Secretary of State to conduct business in California.  Google's principal place of business is in Mountain View, California.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

16.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and plaintiff, as well as most members of the proposed class, are citizens of states different from the state of the defendant.

17.     This Court has personal jurisdiction over Google because Google Inc. is registered with the California Secretary of State to conduct business within California, maintains its headquarters and employees within California, and conducts substantial business within California, such that Google has significant continuous and pervasive contacts with the State of California.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Google transacts significant business within this District. Venue is also proper in this Court because Google's User Agreement provides:

> The laws of California, U.S.A., excluding California's conflict of laws rules, will apply to any disputes arising out of or relating to these terms or the Services. All claims arising out of or relating to these terms or the Services will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal jurisdiction in those courts. [1]

## CLASS ACTION ALLEGATIONS

19.     Plaintiff seeks to represent a class defined as all persons, worldwide, who registered accounts with www.google.com, www.gmail.com, www.youtube.com, www.blogger.com, or any other Google service, from the date that site commenced operation through March 1, 2012 (hereafter, the "Class").  Included are users who registered accounts with Gmail, YouTube, Google+, or any other Google service.  Excluded from the Class are governmental entities, defendant, defendant's affiliates, parents, subsidiaries, employees, officers, directors, and co-conspirators.  Also excluded is any judicial offer presiding over this matter and the members of their immediate families and judicial staff.

20.     Plaintiff also seeks to represent a subclass defined as all members of the Class who registered for Google services from within the state of California (the "California Subclass").

21.     Plaintiff also seeks to represent a subclass defined as all members of the Class who registered for Google services for use on an Android device (the "Android Subclass").

22.     Plaintiff also seeks to represent a subclass defined as all members of the Class who registered for Google services for use on an Android device within the state of California (the "California Android Subclass").

---

[1] *See* http://www.google.com/intl/en/policies/terms/ (accessed March 22, 2012).

23.     Members of the Class, California Subclass, Android Subclass, and California Android Subclass (collectively, the "Subclasses") are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in excess of 300 million.  The precise number of Class members and their identities are unknown to plaintiff at this time but will be determined through discovery of Google's records.  Class members may be notified of the pendency of this action by mail, email, and/or publication.

24.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to:

a.   Whether Google violated its previous privacy policy by merging data across products and services without consumers' consent;

b.   Whether Google deceptively claimed that it would seek the consent of consumers before using their personal information for a purpose other than that for which it was collected;

c.   Whether Google misrepresented the ability of consumers to exercise control over their personal information;

d.   Whether Google misrepresented the extent of its compliance with the U.S.-EU Safe Harbor Framework by claiming that the company complied with the framework while violating the principles of Notice and Choice;

e.   Whether Google's new privacy policy deceptively claims that it does not sell personal information to advertisers when advertisers can, and in fact do, purchase targeting from Google that uses the consumer's personal information and Google profits as a result;

f.   Whether Google's new privacy policy allows Google to profit from the deceptive use of consumers' personal information through acquisition of a large share of advertising revenue;

g.   Whether Google's opt-out practices for its new privacy policy are deceptive and misleading;

h. Whether consumers can effectively opt-out of Google's new privacy policy;

i. Whether Google should, alternatively, provide an opt-in measure for its new privacy policy;

j. Whether Android users can effectively opt-out of Google's new privacy policy;

k. Whether Android users are entitled to the cost of purchasing a new device or reimbursement for the purchase of their current Android device;

l. Whether Google concealed or failed to disclose material information concerning its advertising practices and future plans for revenue growth;

m. Whether Plaintiff and the Class and Android Subclass are entitled to injunctive relief; and

n. Whether Plaintiff and the Class and Android Subclass are entitled to damages and attorneys' fees.

25. Plaintiff's claims are typical of the claims of the proposed class. Each class member was subjected to the same conduct, was harmed in the same way, and has claims for relief under the same legal theories.

26. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained counsel competent and experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

27. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and

comprehensive supervision by a single court on the issue of defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

28.     Unless a class is certified, Google will retain monies received as a result of its conduct that were taken from Plaintiff and proposed Class members. Unless a classwide injunction is issued, Google will continue to commit the violations of law alleged, and the members of the Class and the general public will continue to be misled.

## SUBSTANTIVE ALLEGATIONS

### Google's Business And Services

29.     Google is an advertising company. Its business model is to deliver targeted advertisements through free web-based services. These services include Google Search, Gmail, YouTube, and Google+.

30.     Google's market capitalization exceeded $200 billion as of March 2012. According to Alexa, a web statistics company, Google.com is the most heavily-trafficked website on the Internet.

31.     Google Search is Google's flagship product. It is currently the Internet's most popular search engine, handling over one billion search requests per day. In 2008, Google logged over 1 trillion unique URLs, and it indexes an estimated 40 billion websites. On most searches, users will see targeted ads at the top and side of their search results.

32.     Gmail is a free email service offered by Google. Gmail has 350 million users as of January 2012. When viewing a message in Gmail, targeted advertisements appear at the top of each message. To deliver these advertisements, Gmail's software scans the contents of each email to display relevant ads.

33.     YouTube is a video sharing site that Google purchased in 2006. According to Alexa, YouTube is the third most heavily-trafficked website on the Internet. YouTube serves over 4 billion videos per day. Like other Google products, targeted advertisements appear across YouTube.

1    34.    Google+ is Google's social networking service.  Google+ has 90 million users as of

2  January 19, 2012.  Users must provide their real name and gender when signing up.  Google

3  suspends accounts that use pseudonyms.

4    35.    Google offers dozens of other products and services.  These include Google Docs,

5  Google Maps, Google Calendar, Google Books, Google News, Google Wave, Google Analytics,

6  Google Trends, Blogger, Orkut, and Picasa.

7  **Google's Advertising Programs And Targeted Ads**

8    36.    Google earns over 95% of its revenue from advertising.  In 2011, Google's revenues

9  were $37.91 billion, of which $36.53 billion came from advertising.

10   37.    Google has two major advertising programs, AdWords and AdSense.  With

11  AdWords, advertisers bid to have their ads displayed on Google search results.  For example,

12  competing websites may bid on the search term "Honda Civic."  Then, when a user searches for

13  "Honda Civic," the highest bids will be at the top of the search results.  AdWords ads will also run

14  on sites within Google's content network and Google affiliates.

15   38.    AdSense is another Google advertising program.  With AdSense, Google will pay

16  third-party websites to run Google's advertisements.  In return, the webmaster will allocate space,

17  and Google will choose which ads to run.  In the first quarter of 2011, Google earned $2.43 billion

18  ($9.71 billion annualized), or 28% of its revenue, from AdSense.  AdSense ads appear on

19  YouTube, as well as third-party sites across the Internet.

20   39.    Google's financial success is due to its advertising.  And the success of its

21  advertising is due to Google's ability to run highly-specific, targeted ads.  Google represents,

22  > By making ads more relevant, and improving the connection between advertisers and our
23  > users, we can create more value for everyone.  Users get more useful ads, and these more
> relevant ads generate higher returns for advertisers and publishers.  Advertising is the
24  > lifeblood of the digital economy. . .  Our advertisers and publisher partners have been
> asking us for a long time to offer interest-based advertising.  Advertisers need an efficient
25  > way to reach those who are most interested in their products and services.  And publishers
> can generate more revenue when they connect advertisers to interested audiences.[2]

26

27  ----
[2] Google Official Blog, Making ads more interesting,
28  http://googleblog.blogspot.com/2009/03/making-ads-more-interesting.html (March 11, 2009, 05:01
EST).

40. Advertisers are willing to pay a premium to advertise with Google. Google has an unparalleled ability to run highly-specific ads within target demographics. According to Alex Daley, chief investment strategist at Casey Research, "If they can make the ads more relevant, the logic goes, they can increase the number of advertisers and the price they can charge per click (on each ad). . . Because the click will be from more qualified leads — customers who are more interested in the product — they can grow the revenue."

41. Targeted advertising is the cornerstone of Google's business. Google offers free or low-cost services to attract users and deploy ads.

**Google's Collection Of User Data**

42. Google collects and processes user data to maintain its competitive edge. Google uses this data to sell premium, targeted advertisements. Better user data means better targeting, which means a price premium for Google.

43. Every day, Google's network processes an estimated twenty-four petabytes of user data. The network contains an estimated one million servers.

44. First, Google collects any information submitted when creating a Google Account or a Google+ account, including a user's real name, email address, telephone number, and/or credit card. If a user only provides a credit card number, Google will obtain the user's real name from his or her credit card company. Google represents that "many of our services require you to sign up for a Google Account. When you do, we'll ask for personal information, like your name, email address, telephone number or credit card information. If you want to take full advantage of the sharing features we offer, we might also ask you to create a publicly visible Google Profile, which may include your name and photo."

45. Second, Google tracks browsing history. When loading a website with AdSense, Google places tracking cookies on users' computers to trace them as they browse the Internet. Google represents, "we also show some ads that you might find useful based on the types of websites you like to visit . . . Mary's favorite hobby is gardening. With Google's interest-based advertising technology, Mary will see more relevant gardening ads because she visits many

gardening websites." It also represents, "Other ways we can personalize ads include using your Web History to show ads that are relevant to you. . ."

46.   Third, Google tracks users' Internet searches. Google represents, "When you search for something on Google, for example 'hotels in New York,' the page that you get contains search results and ads that match your search terms. We might personalize ads that appear on search results by using additional information beyond what you just entered in the search box. For example, if you search for 'hotels' and then make a second search for 'travel,' and then a third for 'New York,' the results page for the last search might contain ads for hotels in New York, based on the combination of the three searches."

47.   Fifth, Google tracks hardware details on a users' computer or web-enabled phone. Google represents, "We may collect device-specific information (such as your hardware model, operating system version, unique device identifiers, and mobile network information including phone number). Google may associate your device identifiers or phone number with your Google Account."

48.   Sixth, on web-enabled phones, Google tracks users' location data. Google represents, "When you use a location-enabled Google service, we may collect and process information about your actual location, like GPS signals sent by a mobile device. We may also use various technologies to determine location, such as sensor data from your device that may, for example, provide information on nearby Wi-Fi access points and cell towers."

49.   Seventh, Google scans email content read within Gmail. Google represents, "Gmail scans and processes all messages using fully automated systems in order to do useful and innovative stuff like filter spam, detect viruses and malware, [and] show relevant ads. . . ."

50.   Eighth, Google collects miscellaneous data, such as IP addresses, telephony logs, cookies that uniquely identify users' Google Accounts, browser type, browser language, the date and time of URL requests, and hardware settings.

51.   During a December 3, 2009 interview with CNBC, former Google CEO Eric Schmidt said, "If you have something that you don't want anyone to know, maybe you shouldn't be

1 doing it in the first place, but if you really need that kind of privacy, the reality is that search

2 engines including Google do retain this information for some time. . . ."

3     52.    On August 4, 2010, Eric Schmidt said, "Show us 14 photos of yourself and we can

4 identify who you are. You think you don't have 14 photos of yourself on the internet? You've got

5 Facebook photos! People will find it's very useful to have devices that remember what you want to

6 do, because you forgot. . . But society isn't ready for questions that will be raised as result of user-

7 generated content."

8 **Google's User Data Was Not Consolidated**

9     53.    Google's user data had a serious weakness: Google kept separate records for each

10 service, instead of consolidating its user data among all services. For example, a user's search

11 history on Google Search is not available for YouTube advertisements.

12     54.    In fact, Google's old Privacy Policies *prohibited* Google from cross-referencing

13 user data across many of its services. Prior to March 2012, Google kept a separate Privacy Policy

14 for each service, resulting in about 60 separate policies. Each of these policies stated, "When you

15 sign up for a particular service that requires registration, we ask you to provide personal

16 information. If we use this information in a manner different than the purpose for which it was

17 collected, then we will ask for your consent prior to such use."

18     55.    Users were led to believe that "the purpose for which [their data] was collected" was

19 to set up their account and administer the service. Users did not believe the purpose for collecting

20 their data was tracking and advertising across dozens of Google services.

21 **Facebook Threatens Google's Dominance Over User Data And Targeted Ads**

22     56.    Facebook now threatens Google's domination over user data and targeted

23 advertising. According to Alexa, Facebook is the Internet's second most heavily-trafficked

24 website. Facebook earns about 85% of its revenue from advertising. In 2011, Facebook earned

25 $3.71 billion revenue, of which $3.15 billion came from advertisements.

26     57.    Facebook has superior user data, which it uses to deliver targeted advertisements.

27 When users register for Facebook, they must submit their name, gender, and birthday. Users then

28 create profiles and participate in online events. In doing so, users voluntarily submit lists of

friends, their interests, their favorite shows, their favorite music, what products they use, what webpages they read, what games they play, and what movies they watch.

58.     And unlike Google, Facebook is not bound by restrictive Privacy Policies. Facebook is free to cross-reference user data across its services for advertising purposes.  Unlike Google, Facebook's user data is consolidated.

59.     James Whittaker, a former Google Engineering Director, described Facebook's advantage over user data.  On March 13, 2012, he wrote a public explanation of his resignation:

> It turns out that there was one place where the Google innovation machine faltered and that one place mattered a lot: competing with Facebook. . . Like the proverbial hare confident enough in its lead to risk a brief nap, Google awoke from its social dreaming to find its front runner status in ads threatened. . . Google could still put ads in front of more people than Facebook, but Facebook knows so much more about those people.
>
> Advertisers and publishers cherish this kind of personal information, so much so that they are willing to put the Facebook brand before their own.  Exhibit A: www.facebook.com/nike, a company with the power and clout of Nike putting their own brand after Facebook's?  No company has ever done that for Google and Google took it personally.

60.     In part, Google responded by developing Google+, a social networking site intended to compete with Facebook.  James Whittaker wrote, "Social became state-owned, a corporate mandate called Google+. . . Search had to be social.  Android had to be social.  You Tube, once joyous in their independence, had to be. . . well, you get the point.  Even worse was that innovation had to be social.  Ideas that failed to put Google+ at the center of the universe were a distraction."  Google+ publicly launched on September 20, 2011.  It now has over 90 million users.

**Google Consolidated User Data Across Dozens Of Services To Compete With Facebook**

61.     As part of its effort to compete with Facebook, Google began tracking user data across its services in order to create targeted advertising based on an individual's search history, email content, location data, etc.  For example, a user's Google Search history can influence advertisements that appear on their YouTube page.  Location data from a user's Google Maps searches and the content of a user's Google+ social networking account can influence the results of their Google web searches.

62.     The consolidation of user data across all Google services would have violated Google's own privacy policies. To get around this, Google first eliminated the existing privacy policies (a unique policy for each service, about 60 in total) and created a single, unified Privacy Policy applicable for all Google services.

63.     The change to Google's Privacy Policy took effect on March 1, 2012.

64.     The new policy explains:

> We use the information we collect from all of our services to provide, maintain, protect and improve them, to develop new ones, and to protect Google and our users. We also use this information to offer you tailored content – like giving you more relevant search results and ads. . .

> We may combine personal information from one service with information, including personal information, from other Google services. . . .[3]

65.     From October 14, 2005 to the present, Google's Privacy Policy states, "We will not reduce your rights under this Policy without your explicit consent." However, users were not given a choice. There was no opt-in. There was no simple opt-out; users must manage their privacy settings for each Google product. Android users are left with no remedy but to abandon their phone if they disagree with the new Privacy Policy.

66.     On February 22, 2012, thirty-six Attorneys General discussed their concerns in an open letter to Larry Page, "Unfortunately, Google has not only failed to provide an 'opt-in' option, but has failed to provide meaningful 'opt-out' options as well."

67.     Between July 1, 2004 and March 11, 2009, Google's Privacy Policy states that while there may be changes, "we expect most such changes to be minor." Eliminating the Privacy Policy of every Google service is not minor. Consolidating user data across every Google service is not minor.

68.     James Whittaker, a former Engineering Director who actively worked on Google+, wrote, "Truth is I've never been much on advertising. I don't click on ads. When Gmail displays ads based on things I type into my email message it creeps me out. . . Perhaps Google is right. Perhaps the future lies in learning as much about people's personal lives as possible."

---

[3] Google Privacy Policy, http://www.google.com/policies/privacy/ (Mar. 1, 2012).

**Harm To Computer Users**

69.     If a computer user disagrees with Google's new Privacy Policy, the remedy is to stop using his or her Google Account. But terminating a Google Account is time-consuming, inconvenient, and costly. Users may have Google Accounts for email, advertising, webpage analytics, or other purposes. A loss of a Google Account means a loss of business, advertising, and opportunity.

70.     Small businesses are severely affected if they disagree with the new Privacy Policy. Many small businesses use Google Accounts for company email. Local versions of Google Search may be used to search the company intranet. Removing and replacing Google services is costly and disruptive.

71.     On February 22, 2012, thirty-six Attorneys General wrote in an open letter, "This invasion of privacy will be costly for many users to escape. For users who rely on Google products for their business – a use that Google has actively promoted – avoiding this information sharing may mean moving their entire business over to different platforms, reprinting any business cards or letterhead that contained Gmail addresses, re-training employees on web-based sharing and calendar services, and more."

**Harm To Android Phone Users**

72.     Android is a Linux-based operating system designed for smartphones. It is developed by the Open Handset Alliance, which is led by Google. There are over 300 million Android phones on the market. Over 850,000 new Android phones are activated every day. About half of all smartphones are Android devices.

73.     Android phones are heavily integrated into Google. Email is handled by Gmail. Chat functions are also handled by Google. Apps, music, movies, and books may be purchased on Google Play (previously called the Android Marketplace).

74.     If an Android phone user disagrees with Google's new Privacy Policy, there is no remedy. The user must purchase a new phone or have all smartphone functionality stripped away. This means hundreds of dollars of damages, per Android user.

75.     On February 22, 2012, thirty-six Attorneys General wrote, "Even more troubling, this invasion of privacy is virtually impossible to escape for the nation's Android-powered smartphone users, who comprise nearly 50% of the national smartphone market.  For these consumers, avoiding Google's privacy policy change may mean buying an entirely new phone at great personal expense.  No doubt many of these consumers bought an Android-powered phone in reliance on Google's existing privacy policy, which touted to these consumers that 'We will not reduce your rights under this Privacy Policy without your explicit consent.'  That promise appears not to be honored by the new privacy policy.  Given the way the new privacy policy is being implemented, i.e., without genuine opt-out options and without pre-purchase notice to users of Android-powered smartphones, it seems these users can only register non-consent by abandoning their phone altogether."

**Google Misrepresented The Purpose Of Its New Privacy Policy**

76.     Google has consistently misrepresented the purpose of its new Privacy Policy.  On January 30, 2012, Google sent a letter to eight members of Congress, including Cliff Stearns, Joe Barton, Marsha Blackburn, G.K. Butterfield, Henry Waxman, Edward Markey, Diana DeGette, Jackie Speier.  Google's letter offers two explanations for the privacy policy.  First, it was adopted for simplicity, because it merges over 60 policies into one comprehensive document.  Second, it improves user experiences across Google services.  For example, the letter explains the benefits of using recent Google Search terms to identify relevant videos in YouTube.

77.     Between January and March 2012, Google unveiled an ambitious advertising campaign to relieve concerns over its new Privacy Policy.  The campaign, entitled Good to Know, showcases the benefits of consolidating user data and the security features Google offers.

78.     Google made similar representations on company blogs and explanatory webpages. The message is consistent: Google made the new Privacy Policy for the sake of simplicity, and it improves users' experiences.

79.     But Google's letter and advertising campaign are misleading.  They fail to highlight Google's true goal: consolidating user data for advertising purposes.  Writers, technology experts,

and even former Google employees recognize the new Privacy Policy is actually intended to improve Google's access to user data.

80.     On January 25, 2012, USA Today published an article called "Consumers in the middle of Google-Facebook battle." The article explains, "Google signaled its intent to begin correlating data about its users' activities across all of its most popular services and across multiple devices. The goal: to deliver those richer behavior profiles to advertisers. . . The global online advertising market is expected to swell to $132 billion by 2015, up from $80 billion this year, according to eMarketer. Google and Facebook are putting their abilities to index individuals' online activity and behaviors into high gear to tap into this market, analysts say."

81.     On January 25, 2012, BBC News published an article called "Backlash over Google move to change privacy settings." The article identified advertising as an objective of the move. It explains, "Google said the update would offer more relevant searches. But critics say it has more to do with the data battle the search giant is waging with rival Facebook."

82.     On January 28, 2012, the Altimeter Group, an Internet consulting company, posted a blog article called "Google's New Privacy Policy Critical to Competition with Facebook." Rebecca Lieb, an analyst, wrote that "Google needs a 360 degree view of the customer now more than ever. Why? Because Facebook's already got it. Or is at least a lot closer to having it than Google is if all Google's information is separately warehoused. Facebook is currently better positioned than Google" to know what users are doing as they surf the Internet.

83.     On February 22, 2012, a consumer advocacy group called the Center for Digital Democracy ("CDD") petitioned the U.S. Federal Trade Commission ("FTC") to enforce a October 13, 2011 Consent Order with Google, which prevents Google from misrepresenting the extent to which it "maintains and protects the privacy and confidentiality" of user data. The filing alleges that the consolidation of user data "has nothing to do with making it 'easier' or 'more convenient' [to use Google services]. . . In particular, Google fails to inform its users that the new privacy regime is based on its own business imperatives: to address competition from Facebook; to finely profile and target through audience buying. . . ."

84.     On February 22, 2012, thirty-six Attorneys General sent an open letter to Larry Page, Google's CEO.  The letter expressed concerns over the new Privacy Policy and casts doubt on Google's explanation to Congress.  It says, "Your company claims that users of Google products will want their personal information shared in this way because doing so will enable your company to provide them with a 'simple product experience that does what you need, when you want it to,' among many other asserted benefits.  If that were truly the case, consumers would not only decline to opt out of the new privacy policy, but would freely opt *in* if given the opportunity.  Unfortunately, Google has not only failed to provide an 'opt-in' option, but has failed to provide meaningful 'opt-out' options as well."

85.     The Attorneys General letter further elaborates, "We have reviewed your recently published letter to several members of Congress regarding your privacy policy change, as well as the letters recently sent to several attorneys general, and while we appreciate your efforts to inform elected officials and other members of the public, the letters have not allayed our concerns regarding the multiple issues discussed above.  Indeed, they have raised as many questions as they have answered."

86.     James Whittaker, a former Engineer Director who worked on the Google+ project, writes, "The Google I was passionate about was a technology company that empowered its employees to innovate.  The Google I left was an advertising company with a single corporate-mandated focus."

**Google Misrepresented How It Discloses User Data**

87.     In its January 30, 2012 letter to Congress, Google wrote, **"We are not selling our users' data.**  We do not sell users' personally identifiable information, and that will not change under the updated privacy policy. . . Google does not sell, trade, or rent personally identifiable user information, and shares it with third parties only with users' consent and in the limited circumstances described in our privacy policy, such as to satisfy valid legal requests." (emphasis in original).

88.     This is misleading.  Advertisers pay a premium to place their ads with Google because it has user data.  User data is pivotal to the success of Google's advertising programs.

1  User data is a material factor when advertisers partner with Google — advertisers know Google

2  has an unparalleled ability to place highly-relevant, targeted ads by analyzing user data.

3      89.     When bidding on AdWords, Google reveals information from Google Search.  By

4  examining the bid price, researchers could gauge the popularity of certain keywords.  For example,

5  researchers found they can discover flu outbreaks and changes in unemployment by analyzing the

6  popularity of search terms.  Google even launched Google Flu Trends, which uses search terms to

7  predict flu outbreaks.

8  **Google Violated Its 2011 Consent Decree With The FTC Over Google Buzz**

9      90.     On February 9, 2010, Google launched Google Buzz, a social networking program

10  within Gmail.  By default, Google Buzz automatically made certain information public, such as a

11  list of names of common Gmail contacts.  In one dramatic case, this privacy breached caused a

12  woman's abusive ex-husband to discover her workplace.

13      91.     After an FTC suit, Google entered into a Consent Decree on March 30, 2011 that

14  "bars the company from future privacy misrepresentations, requires it to implement a

15  comprehensive privacy program, and calls for regular, independent privacy audits for the next 20

16  years."

17      92.     Specifically, Section I.A prohibits Google from misrepresenting "the extent to

18  which respondent maintains and protects the privacy and confidentiality of any covered

19  information, including, but not limited to, misrepresentations related to: (1) the purposes for which

20  it collects and uses covered information, and (2) the extent to which consumers may exercise

21  control over the collection, use, or disclosure of covered information."  Google violated this section

22  because it misrepresented the purpose of consolidating user data.  Google represented it

23  consolidated user data to make its Privacy Policy simpler, and to improve user experience.  To the

24  contrary, the new Privacy Policy is intended to facilitate targeted advertising.

25      93.     Section II.B requires Google to "[o]btain express affirmative consent from the

26  Google user" to new or additional sharing of user data.  Google violated this section.  Users were

27  not given a choice.  There was no opt-in.  There was no simple opt-out; users must manage their

28

privacy settings for each Google product.  Android users are left with no remedy but to abandon their phone if they disagree with the new Privacy Policy.

## COUNT I
### Breach Of Contract

94.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

95.     This count is brought against Defendant by Plaintiff individually, and on behalf of the Class and all Subclasses.

96.     Before March 1, 2012, Google's Privacy Policies stated, "When you sign up for a particular service that requires registration, we ask you to provide personal information.  If we use this information in a manner different than the purpose for which it was collected, then we will ask for your consent prior to such use."  However, "the purpose for which [user data] was collected" was to create and manage users' accounts.  It was not for tracking and advertising.  Users did not agree to have Google consolidate their user data for advertising.  Users did not agree for Google to share this information across its dozens of services.  Users did not consent to the change in the Privacy Policy because there is no simple and effective way to opt out.  Class members with Android phones are forced to discard their phones or abandon smartphone functionality if they disagree.

97.     Between July 1, 2004 and March 11, 2009, Google's Privacy Policy stated that while there may be changes, "we expect most such changes to be minor."  Eliminating the Privacy Policy of every Google service is not minor.  Consolidating user data across every Google service is not minor.

98.     Google breached its contract with Plaintiff and members of the Class by consolidating and sharing user data across its dozens of services for advertising purposes.

99.     Google breached its contract with Plaintiff and members of the Class by failing to provide a simple and effective way to opt out.

100. Google breached its contract with Plaintiff and members of the Class by enacting a major change in its Privacy Policies: eliminating them entirely and creating a single, unified policy with substantially altered terms.

101. Plaintiff and Class members suffered and will continue to suffer damages including by not limited to loss of their personal information, deprivation of money earned by the use of such information, and the cost of purchasing a new phone for members of the Android Subclass, all of which have ascertainable value to be proven at trial.

## COUNT II
### Violation Of California's Consumer Legal Remedies Act,
### California Civil Code §1750, *et seq.*
### (Injunctive Relief Only)

102. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

103. This count is brought against Defendant by Plaintiff individually, and on behalf of the California Subclass and the California Android Subclass.

Google violated Civil Code § 1770(a)(9), (14) and (16) by intentionally and knowingly misrepresenting that Plaintiff and the Class have full control to prevent their user data being used for advertising. Google did so with the intent of getting members to register for, and to use, its products and services, even while Google knew there was no simple and effective way to prevent one's user data from being used for targeted advertising.

104. Moreover, Google intentionally misrepresented the ability of Plaintiff and Class members to prevent use of their user data in advertisements so Google could enjoy substantial profits by selling targeted advertisements at a premium.

105. Google also knowingly and intentionally failed to seek and acquire informed consent regarding the changes to its Privacy Policy.

106. Google also knowingly and intentionally misrepresented the reasons for consolidating user data.

107. Google led Plaintiff and the Class to believe that they had control of their user data, encouraging Plaintiff and the Class to make Google products indispensable to their lives, and then

1    using Plaintiff's and the Class' user data in a manner in which Plaintiff and the Class cannot

2    effectively opt out.

3         108.    Plaintiff and members of the Class have suffered harm as a result of these violations

4    of the CLRA because they have been deprived of money earned by the misrepresentations, in an

5    amount to be proven at trial.

6         109.    On March 29, 2012, prior to the filing of this Complaint, a CLRA notice letter was

7    served on Defendant which complies in all respects with California Civil Code §1782(a).  Plaintiff

8    Nicholas Anderson sent Defendant a letter via certified mail, return receipt requested, advising

9    Defendant that they are in violation of the CLRA and demanding that they cease and desist from

10   such violations and make full restitution by refunding the monies received therefrom.  Defendant

11   was further advised that in the event that the relief requested has not been provided within (30)

12   days, Plaintiff will amend this Complaint to include a request for monetary damages pursuant to

13   the CLRA.  A true and correct copy of Plaintiff's CLRA letter is attached hereto as Exhibit A.

14        110.    Wherefore, Plaintiff presently seeks only injunctive relief for these violations of the

15   CLRA.

16                                    **COUNT III**
                       **Violation Of California's Unfair Competition Law ("UCL"),**
17                     **California Business & Professions Code §§ 17200 et seq.**

18        111.    Plaintiff hereby incorporates by reference the allegations contained in all preceding

19   paragraphs of this complaint.

20        112.    This count is brought against Defendant by Plaintiff individually, and on behalf of

21   the California Subclass and the California Android Subclass.

22        113.    Google violated the "unlawful" prong of the UCL by their nonconsensual use of

23   Plaintiff's and Class members' personal information in violation of the Federal Wiretap Act, the

24   Stored Electronic Communications Act, and Penal Code § 502, as described below.

25        114.    Google also violated the "fraudulent and deceptive" prong of the UCL by

26   intentionally and knowingly misrepresenting that Plaintiff and the Class have full control to

27   prevent their user data being used for advertising.  Google did so with the intent of getting

28

CLASS ACTION COMPLAINT                                                                        21

members to register for, and to use, its products and services, even while Google knew there was no simple and effective way to prevent one's user data from being used to target advertising.

115.    Moreover, Google intentionally misrepresented the ability of Plaintiff and the Class members to prevent use of their user data in advertisements so Google could enjoy substantial profits by selling targeted advertisements at a premium.

116.    Plaintiff and the Class justifiably relied upon those misrepresentations when deciding to sign up for and use Google's products and services, and when using those services to run searches for their interest, exchange emails with friends, edit and share their pictures, stream videos, and search for directions. Plaintiff and the Class were harmed in that they suffered damages of deprivation of money earned by the misrepresentations, in an amount to be proven at trial.

117.    Google also violated the "fraudulent" prong of the UCL by knowingly and intentionally failing to seek and acquire informed consent regarding the changes to its privacy policy.

118.    Google violated the "unfair" prong of the UCL by leading Plaintiff and the Class to believe that they had control of their user data, encouraging Plaintiff and the Class to make Google products indispensable to their lives, and then using Plaintiff's and the Class' user data in a manner in which Plaintiff and the Class cannot effectively opt out.

119.    Google's unfair, deceptive, and fraudulent practices originated in California. Decisions concerning Google's privacy policies and advertising decisions were made in California.

120.    Plaintiff and the Class have a vested, monetary interest in the use of their user data to target advertisements, and Google has deprived them of that interest.

121.    Plaintiff and the Class each lost money to which they were entitled in the form of compensation for the use of their user data, and in which they had a vested interest, by virtue of Google's conduct. They are entitled to restitution of such sums.

122.    Pursuant to Bus. & Prof. Code §17203, Plaintiff seeks an order permanently enjoining Google from continuing to engage in the unlawful, unfair, and deceptive conduct alleged herein. Plaintiff and the Class also seek and order requiring Google to:

(a) immediately cease the conduct described herein;

(b) make full restitution of all monies wrongfully obtained;

(c) disgorge all ill-gotten revenues and/or profits; and

(d) award Plaintiff and the Class reasonable costs and attorneys' fees pursuant to Cal. Code of Civ. Proc. §1021.5.

## COUNT IV
### Violations Of The Federal Wiretap Act
### 18 U.S.C. § 2511

123. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

124. This count is brought against Defendant by Plaintiff individually, and on behalf of the Class and all Subclasses.

125. The Federal Wiretap Act ("FWA"), as amended by the Electronic Communications Privacy Act of 1986, prohibits the willful interception of any wire, oral or electronic communication.

126. Section 2520(a) of the FWA provides a private right of action to any person whose wire, oral, or electronic communication is intercepted or disclosed. 18 U.S.C. § 2520(a).

127. The FWA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce..." *Id.* at § 2510(12).

128. The FWA defined "wire communications" as "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." *Id.* at § 2510(1).

129. The data Google is intercepting and consolidating are "communications" within the meaning of the Wiretap Act.

130. Plaintiff and member of the class are persons whose electronic communication were intercepted within the meaning of 18 U.S.C. § 2520.

131.    Google is intercepting and consolidating the personal information of Plaintiff and all others similarly situated, and is placing cookies on its users' computers that intercept records of Google users' communications.

132.    Neither the Plaintiff nor members of the Class consented, nor were they aware that Google was violating its own privacy policy by tracking and consolidating consumers' internet use across Google platforms, creating a single profile of each consumer. Each profile contains consolidated information about the individual.

133.    Google intentionally and willfully intercepts the electronic communication of its users and intentionally and willfully aggregates users' personal information for its own financial benefit.

134.    18 U.S.C. § 2520 provides for preliminary, equitable and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 a day for each day of violation, actual and punitive damages, reasonable attorneys' fees, and disgorgement of profits earned by Google as a result of the above-described violations.

## COUNT V
### Violations Of The Stored Electronic Communications Act
### 18 U.S.C. §2701

135.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

136.    This count is brought against Defendant by Plaintiff individually, and on behalf of the Class and all Subclasses.

137.    The Stored Communications Act ("SCA") contains provisions that provide consumers with redress if a company mishandles their electronically stored information. The SCA was designed, in relevant part, "to protect individuals' privacy interests in personal and proprietary information." S.Rep. No. 99-541, at 3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, at 3557.

138.    Section 2702(a)(1) of the SCA provides "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

139. "Electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." *Id.* at § 2510(15).

140. Google provides an "electronic communication service to the public" within the meaning of the SCA because it provides consumers at large with the ability to send or receive wire or electronic communications, and provides services to run internet searches, exchange emails, edit and share pictures, stream videos, and search for directions.

141. Section 2702(a)(2)(A) of the SCA provides "a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such service." 18 U.S.C. § 2702(a)(2)(A)

142. The SCA defines "remote computing service" as "the provision to the public of computer storage or processing services by means of an electronic communications system." 18 U.S.C. § 2711(2).

143. An "electronic communications system" is defined by the SCA as "any wire, radio, electromagnetic, photooptical or photoelectronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications." 18 U.S.C. § 2510(14).

144. Google provides remote computing services to the public because it provides consumers at large with the ability to send or receive wire or electronic communications, and provides services to run internet searches, exchange emails, edit and share pictures, stream videos, and search for directions.

145. By intentionally exceeding its authorized access to consumers' electronic communications stored on Google's system, and by divulging such information for their own pecuniary gain in the form of advertising sales, Google has violated Sections 2702(a)(1) and (2) of the SCA.

146.    Google also intentionally places cookies on consumers' computers that access members' stored communications without authorization, violating Sections 2702(a)(1) and (2) of the SCA.

147.    As a result of Google's conduct described herein and its violations of § 2702 Plaintiff and Class members have suffered injuries, including deprivation of money earned by the use of Plaintiff and Class members' personal information.  Plaintiff, on his own behalf and on behalf of the Class, seeks an order awarding himself and the Class the maximum statutory damages available under 18 U.S.C.§ 2707.

## COUNT VI
### Violation Of California Penal Code § 502

148.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

149.    This count is brought against Defendant by Plaintiff individually, and on behalf of the California Subclass and California Android Subclass.

150.    Cal. Penal Code Section 502 provides that it is unlawful to knowingly access and without permission take, copy or make use of any data from a computer, computer system, or computer network, or take or copy any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.  Cal. Penal Code §502(c)(2).

151.    Cal. Penal Code Section 502 defines "access" to mean "gain entry to, instruct, or communication with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." *Id.* at § 502(b)(1).

152.    Cal. Penal Code Section 502 defines "computer network" to mean "any system that provide communication between one or more computer systems and input/output devices…" *Id.* at §502(b)(2).

153.    Google has knowingly and without permission, accessed and made use of Plaintiff's and Class members' computers, computer systems, computer networks, and data stored therein, in order to wrongfully obtain and control data and other information of monetary value.

CLASS ACTION COMPLAINT

154.     Google has knowingly and without permission taken, copied, or made use of data from Plaintiff's and Class members' computers, computer systems, computer networks, as well as taken and copied resident data.

155.     Google's unauthorized access and use has damaged and caused loss to Plaintiff and members of the Class.

156.     Google's actions constitute violations of California Penal Code § 502(c)(2).

## COUNT VII
### Trespass To Chattels

157.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

158.     This count is brought against Defendant by Plaintiff individually, and on behalf of the Class and all Subclasses.

159.     A trespass to chattel is committed by intentionally intermeddling with a chattel in the possession of another.

160.     A trespass to chattel is also committed by fraud, through a misrepresentation to induce another to voluntarily dispossess himself of a chattel.

161.     Google has committed a trespass to chattels by intentionally intermeddling with Plaintiff's and the Class' personal information, including without limitation contents of Gmail accounts.

162.     In addition, Google has committed a trespass to chattels by misrepresenting the terms upon which it would use Plaintiff's and the Class' personal information to induce Plaintiff and the Class to voluntarily use Google's products.

163.     Plaintiff and the Class were damaged by Google's actions.

## COUNT VIII
### Unjust Enrichment / Common Law Restitution

164.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

CLASS ACTION COMPLAINT

165.     This count is brought against Defendant by Plaintiff individually, and on behalf of the Class and all Subclasses.

166.     Google received benefits from, and at the expense of Plaintiff and members of the Class, by accessing their wire or electronic communications over the internet, consolidating them, and using the aggregated information to increase its advertising revenue.

167.     Upon information and belief, Google realized such benefits through either sales to third parties, and/or greater knowledge of its own consumers' behavior without their consent.

168.     It would be unjust and inequitable for Google to retain those benefits at the expense of Plaintiff and Class members.

## COUNT IX
### Violation Of The Consumer Fraud Laws Of The Various States

169.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

170.     This count is brought against Defendant by Plaintiff individually, and on behalf of the Class and all Subclasses.

171.     By consolidating user data across its services for advertising purposes, while representing that the change was made for other reasons, Defendant has engaged in unfair competition or unlawful, unfair, misleading, unconscionable, or deceptive acts in violation of the state consumer statutes listed below.

172.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ALA. CODE § 8.19-1, *et seq.*

173.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ALASKA STAT. CODE § 45.50.471, *et seq.*

174.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ARIZ. REV. STAT. § 44-1522, *et seq.*

175.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE ANN. § 4-88-107, *et seq.*

176.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of COLO. REV. STAT. § 6-1-101, *et seq.*

177.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b, *et seq.*

178.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of DEL. CODE ANN. tit. 6, § 2511, *et seq.*

179.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. CODE ANN. § 28-3901, *et seq.*

180.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. ANN. § 501.201, *et seq.*

181.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of GA. CODE ANN. §10-1-392, *et seq.*

182.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of HAW. REV. STAT. § 480, *et seq.*

183.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, *et seq.*

184.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILL. COMP. STAT. 505/1, *et seq.*

185.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of IND. CODE ANN. § 24-5-0.5-1, *et seq.*

186.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of IOWA CODE §714.16, *et seq.*

187.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of KAN. STAT. § 50-623, *et seq.*

188.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of KY. REV. STAT. ANN. § 367.110, *et seq.*

189.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of LA. REV. STAT. § 51:1404, *et seq.*

190.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ME. REV. STAT. tit. 5, § 205-A, *et seq.*

191.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. CODE. ANN., COM. LAW § 13-101, *et seq.*

192.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation MASS. GEN LAWS ch. 93A, §1, *et seq.*

193.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. COMP. LAWS § 445.901, *et seq.*

194.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MINN. STAT. § 8.31, *et seq.*

195.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MISS. CODE ANN. § 75-24-3, *et seq.*

196.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MO. REV. STAT. § 407.010, *et seq.*

197.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE ANN. § 30-14-101, *et seq.*

198.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT. § 59-1601, *et seq.*

199.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of NEV. REV. STAT. 598.0903, *et seq.*

200.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. ANN. § 358-A:1, *et seq.*

201.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. ANN. § 57-12-1, *et seq.*

202.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. GEN. BUS. LAW § 349, *et seq.*

203.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J.S.A. 56:8-1, *et seq.*

204.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. GEN. STAT. § 75-1.1, *et seq.*

205.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, *et seq.*

206.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of OKLA. STAT. tit. 15, § 751, *et seq.*

207.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, *et seq.*

208.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 PA. CONS. STAT. § 201-1, *et seq.*

209.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. GEN. LAWS § 6-13.1-1, *et seq.*

210.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE § 39-5-10, *et seq.*

CLASS ACTION COMPLAINT

211.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. CODIFIED LAWS § 37-24-1, *et seq.*

212.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of TENN. CODE ANN. § 47-18-101, *et seq.*

213.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of TEX. BUS. & COM. CODE ANN. § 17.41, *et seq.*

214.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of UTAH CODE. ANN. § 13-11-1, *et seq.*

215.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of VT. STAT. ANN. tit. 9, § 2451, *et seq.*

216.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of VA. CODE ANN. § 59.1-196, *et seq.*

217.   Defendant has engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of WASH. REV. CODE § 19.86.010, *et seq.*

218.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of W. VA. CODE § 46A-6-101, *et seq.*

219.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT. § 100.18, *et seq.*

220.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN. § 40-12-101, *et seq.*

221.   The acts, practices, misrepresentations and omissions by Defendant described above, and Defendant's dissemination of deceptive and misleading advertising and marketing materials in connection therewith, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the

meaning of each of the above-enumerated statutes, because each of these statutes generally prohibits deceptive conduct in consumer transactions, and Defendant violated each of these statutes by repeatedly representing that consolidating user data was for purposes other than advertising and by providing no simple and effective means to opt out.

222.    Plaintiff and Class Members were injured as a direct and proximate result of Defendant's unfair, deceptive and/or unconscionable acts and practices, because: (a) they would not have created a Google Account or continued to use a Google Account if the true facts concerning their user data had been known; (b) members of the Android Subclass and California Android Subclass would not have purchased an Android phone if the true facts concerning Google's use of their user data had been known; and (c) their Google services did not perform as promised.

## PRAYER FOR RELIEF

223.    WHEREFORE, Plaintiff, on behalf of himself and on behalf of the members of the proposed Class, Android Subclass, California Subclass, and California Android Subclass prays: (a) for all forms of relief set forth above, (b) for an order certifying the proposed Class, Android Subclass, California Subclass, and California Android Subclass, and appointing Plaintiff and his undersigned counsel of record to represent the proposed classes, (c) for punitive damages, (d) for costs of suit herein; (e) for both pre- and post-judgment interest on any amounts awarded, (f) for payment of reasonable attorneys' fees, and (g) for such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

224.    Plaintiff demands a trial by jury.

/
/
/
/
/

Dated:  March 29, 2012

Respectfully submitted,

By: _Sarah N. Westcot_
    /Sarah N. Westcot

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sarah N. Westcot (State Bar No. 264916)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
            swestcot@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
369 Lexington Avenue, 10th Floor
New York, NY  10017
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiff*

I, Nicholas Anderson, declare as follows:

1.    I am a plaintiff in this action and a citizen of the State of California. I have personal knowledge of the facts herein and, if called as a witness, I could and would testify competently thereto.

2.    The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that defendant Google, Inc. does business in Santa Clara County and a substantial portion of the transaction complained of occurred in Santa Clara County, within the Northern District of California.

3.    I purchased an Android phone prior to March 1, 2012. At the time of my purchase, I was familiar with Google's privacy policy, and relied on such in deciding to purchase the Android phone. I would not have purchased an Android phone had I known Google would breach its existing privacy policies by consolidating my user data.

I declare under the penalty of perjury, under the laws of the State of California that the foregoing is true and correct, executed on March 2⁄6, 2012 at San Francisco, California.

Nicholas Anderson

# EXHIBIT A

# BURSOR & FISHER
P.A.

1990 N. CALIFORNIA BLVD
WALNUT CREEK, CA 94596
www.bursor.com

SARAH N. WESTCOT
TEL: 925.300.4455
FAX: 925.407.2700
swestcot@bursor.com

March 29, 2012

***Via Certified Mail – Return Receipt Requested***

Google Inc.
1600 Amphitheatre Parkway
Mountain View, CA  94043

*Re:*      *Demand Letter Pursuant to California Civil Code § 1782*

To Whom It May Concern:

      This letter serves as a preliminary notice and demand for corrective action by Google Inc. ("Google") pursuant to the provisions of California Civil Code § 1782, on behalf of our client, Nicholas Anderson, and all other persons similarly situated.

      On March 1, 2012, Google implemented a new Privacy Policy that allows it to consolidate user data across dozens of Google services, including Google Search, Gmail, YouTube, Google+, and AdSense.  For example, from within Youtube, Google can now access users' search histories from Google Search, browsing habits from AdSense, and social networking data from Google+.  Previously, Google did not consolidate its user data across its services.  Each service kept its own records of users' activities.  Users expected this level of privacy when they signed up for Google services prior to March 1, 2012.

      Google has engaged in a uniform marketing and advertising program representing that its new Privacy Policy — and the decision to consolidate user data — was implemented for the sake of simplicity and to improve users' experiences on Google services.  These representations were prominently displayed on Google's Official Blog, Google's Good to Know advertising campaign, and in an open letter to eight Congressional representatives.

      However, Google misled consumers because it failed to highlight its true goal: consolidating user data for advertising purposes.  Writers, technology experts, and even a former Google Engineering Director recognize that the new Privacy Policy is intended to help Google place targeted advertisements.  Advertisers are willing to pay a premium to advertise with Google because it has this user data.

      Google's previous privacy policies prohibit the consolidation of user data.  Users did not agree to have Google consolidate their user data for advertising.  Users did not agree to share this information across Google's dozens of different services.  There is no simple and effective way to opt out; users must manage their privacy settings in each Google service.

**BURSOR&FISHER**
P.A.

If a computer user disagrees with Google's new Privacy Policy, the remedy is to stop using his or her Google Account. But terminating a Google Account is time-consuming, inconvenient, and costly. Users may have Google Accounts for email, advertising, webpage analytics, or other purposes. A loss of a Google Account means a loss of business, advertising, and opportunity.

Users with Android phones are in the worst position. Google connectivity is heavily integrated into these devices. Google connectivity is used for email, chat, and purchasing content. If an Android user disagrees with the change, the only remedy is to discard the phone or cease using smartphone functionality.

Nicholas Anderson is a citizen of the State of California and is a consumer as defined in California Civil Code §1761(d) in that he purchased an Android phone and has a Google account "for personal, family or household purposes." At the time of purchase, Mr. Anderson was familiar with Google's existing privacy policies, and he relied on such misrepresentations in deciding to purchase his Android phone.

Mr. Anderson would not have purchased an Android phone if he had known that Google would breach its existing privacy policies by consolidating his user data. Mr. Anderson suffered a loss of money as a result of Google's misrepresentation in the amount of the purchase price of his Android phone.

By misrepresenting its existing privacy policies and misrepresenting the reasons for consolidating user data, Google has violated numerous provisions of California law including the Consumers Legal Remedies Act, Civil Code § 1770, including but not limited to subsections (a)(9), (14), and (16).

We hereby demand that Google immediately (1) abide by the terms of its privacy policies prior to March 1, 2012; (2) remove consolidated user data from its possession; (3) adequately disclose that advertising considerations were a material factor in Google's decision to consolidate user data; (4) cease using consolidated user data to deliver targeted advertisements; and (5) agree that it will only consolidate user data on a purely opt-in basis.

It is further demanded that Google preserve all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1. All documents concerning the development and implementation of consolidating user data;

2. All communications with advertisers and marketing affiliates concerning the potential uses of consolidated user data;

3. All documents comparing Google's user data to the data held by its competitors, including Facebook; and

4. All communications with customers concerning complaints or comments relating to consolidated user data.

**BURSOR&FISHER**
P.A.

Please comply with this demand within 30 days from receipt of this letter. If the relief requested has not been provided within 30 days from receipt of this letter, Plaintiff will amend the Complaint to include a request for monetary damages pursuant to the CLRA.

We are willing to negotiate with Google to attempt to resolve the demands asserted in this letter. If Google wishes to enter into such discussions, please contact me immediately.

If Google contends that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter, but in no event later than 30 days from the date of receipt.

Very truly yours,

Sarah N. Westcot

Sarah N. Westcot